**Steven Frank KADRLIK,
Petitioner, Respondent,**

v.

**COMMISSIONER OF PUBLIC
SAFETY, Appellant.**

No. C1–86–148.

Court of Appeals of Minnesota.

June 3, 1986.

Steven A. Sondrall, Robbinsdale, for respondent.

Hubert H. Humphrey, III, Atty. Gen., Jeffrey S. Bilcik, Lawrence Schultz, Sp. Asst. Attys. Gen., St. Paul, for appellant.

Heard, considered and decided by POPOVICH, C.J., and PARKER and CRIPPEN, JJ.

## OPINION

PARKER, Judge.

Respondent Steven Kadrlik's driving privileges were revoked pursuant to the implied consent law, and he petitioned for judicial review. The trial court rescinded the revocation, finding that the Intoxilyzer test record was faulty. The Commissioner appeals from the trial court's order. Kadrlik did not file a brief, and this matter is proceeding pursuant to Minn.R.Civ.App.P. 142.03.

## FACTS

On October 13, 1984, State Trooper Michelle Tuchner arrested Kadrlik for driving while under the influence of alcohol. She transported him to the Eagan Police Department and read him the implied consent advisory; he agreed to take a breath test.

Tuchner, a certified Intoxilyzer operator, began the test by pushing the "start test" button and feeding the test record into the machine. The machine began a diagnostic test to ensure its proper functioning. Next, an air blank test was run, which indicated that no alcohol was in the air.

Tuchner checked Kadrlik's mouth and then had him blow into the machine. The first breath sample yielded results of .117 and .119. Tuchner then performed a calibration standard test. She attached the simulator solution to the machine and ran a test on it. The simulator solution has a known alcohol concentration of approximately .11 and is tested to ascertain the machine's proper functioning. The simulator solution test yielded results of .099 and .098, which is below the sought-after range of .10 to .12. The test record indicated the solution number was 84063.

Kadrlik then provided a second breath sample, which yielded results of .118 and .119. The breath correlation between the samples given by Kadrlik was 100 percent, and the final value was .11.

Tuchner testified that the simulator solution was getting old. She said that 20 subjects can be run on one simulator solution, and Kadrlik was the last person on the log. The concentration of alcohol in the solution does not stay the same from test to test, but drops a minute amount each time it is used. After 20 tests, the drop is noticeable.

Tuchner testified that the Bureau of Criminal Apprehension (BCA) taught that when the simulator solution is old or depleted, it must be replaced with fresh solution. The fresh solution is put into the jar and brought up to the proper operating temperature, and new calibration standard tests must be run. If, with the fresh solution, the results are within .10 to .12, the machine has been shown to be functioning properly. If a .099 reading were obtained after replacing the old solution, it would suggest that the machine was not operating properly. Tuchner explicitly testified several times that she followed the procedure, changed the solution, and ran a new test from which she obtained readings of .108, .109, and .110, showing the machine to be operating correctly. The record for the retest indicated the solution number was 84063.

Tuchner testified she was instructed that the outcome of the calibration standard test has no effect on the subject test and that it is unnecessary to run another test on the subject.

The trial court concluded the test was faulty and could not be considered a true and correct value nor indicate beyond a reasonable doubt that the subject was driving while under the influence of alcohol. The revocation of Kadrlik's driving privileges was rescinded, and the Commissioner appealed from that order. Kadrlik moved this court to remand the matter to the trial

court, conceding that the trial court employed an improper standard. This court dismissed the appeal and ordered the remand. On remand the trial court issued an order stating that the facts, as found by the court, prove by a fair preponderance of the evidence that the Commissioner did not sustain his burden and noted that its use of "beyond a reasonable doubt" was a misstatement. The Commissioner again appeals the trial court's order.

## ISSUES

1. Did the trial court clearly err when it determined that the same simulator solution was used for the retest and Kadrlik's test?

2. Did the Commissioner fail to meet his burden of proving the test was valid and reliable?

## DISCUSSION

### I

The trial court's decision to rescind the revocation of Kadrlik's driving privileges was based on the fact that the simulator solution numbers for both tests of the machine were the same and his inference that the same simulator solution was therefore used on both tests. A memorandum attached to the first order stated:

> Exhibits 2 and 3 show the Simulator Solution Number to be identical, namely 84063. The retest was taken almost one hour after the test of the [respondent]. In a case where the reported value of a subject is .11, the care exercised in testing this Intoxilyzer when it showed a faulty test reading was not sufficient when the same simulator solution, Number 84063, indicated by the two exhibits, was used on the retest and when subject was not retested if the operator thought the machine was now accurate even with the use of the same solution.

The trial court's inference that the same solution was used may not be reversed unless clearly erroneous. *State, Department of Highways v. Beckey*, 291 Minn. 483, 486–87, 192 N.W.2d 441, 444–45 (1971).

A trial court's findings may be set aside only when the reviewing court is left with a definite and firm conviction that a mistake has been made, after a review of the entire record. *City of Minnetonka v. Carlson*, 298 N.W.2d 763, 766 (Minn.1980).

The finding that the simulator solution *numbers* for Kadrlik's test and the subsequent retest were the same is clearly supported by the record; an examination of the Intoxilyzer test records indicate both have the same simulator solution number.

■ The inference that the simulator *solution* was the same for both tests is contrary to the record. Tuchner testified repeatedly that, when the solution becomes old and low readings are obtained, the BCA procedure is to change the solution and run a calibration standard test on the replacement solution and that she in fact did so here. Her testimony was not contradicted. Nor was there testimony as to the significance or meaning of the fact that the simulator solution numbers for both tests were the same. The trial court apparently inferred that this meant the solution had not been replaced, despite Tuchner's uncontradicted, repeated testimony that it had been. We are left with the firm conviction that the trial court's inference that the solution was the same for both tests was clearly erroneous.

### II

■ The Commissioner has the burden of establishing that the administration of the Intoxilyzer test conforms to the procedure necessary to ensure reliability; the opponent must then suggest why the test was untrustworthy. *State v. Dille*, 258 N.W.2d 565, 567, 568 (Minn.1977); *Tate v. Commissioner of Public Safety*, 356 N.W.2d 766, 767–68 (Minn.Ct.App.1984). A low simulator solution reading does not automatically render a test unreliable. *Johnson v. Commissioner of Public Safety*, 374 N.W.2d 577, 579 (Minn.Ct.App. 1985). There must be some indication that the low reading would unduly exaggerate the test results. *Noren v. Commissioner*

*of Public Safety,* 363 N.W.2d 315, 318 (Minn.Ct.App.1985). In this case, Tuchner testified that the simulator solution reading did not affect the test results.

A low calibration standard reading was obtained, and Tuchner determined the cause ("used-up" simulator solution) and corrected it (by using fresh solution) without affecting the test results. This court recently addressed a similar issue in *Feil v. Commissioner of Public Safety,* 383 N.W.2d 420 (Minn.Ct.App.1986), in which a simulator solution reading of .052 was obtained. The officer determined that the low reading was due to a loose fit on the plastic hose connecting the simulator solution to the Intoxilyzer. After completing the driver's breath test, the officer cut off the end of the hose and reattached it to provide a tight fit and ran a test on the solution again, this time obtaining a result within the proper range. A BCA witness testified that the officer had followed the proper procedure to correct the low simulator solution reading. The driver's expert testified that the test was invalid. The trial court rescinded the revocation of the driver's license. On appeal this court reversed, concluding that the trial court erred in finding the Commissioner did not make a prima facie showing that the test results were reliable. *Id.* at 423–24.

■ Similarly, Tuchner determined the cause of the low calibration standard reading and replaced the simulator solution. She then ran a retest of the machine which resulted in a reading within the proper range. The Commissioner met his burden of proving the test valid and reliable, and no evidence was presented to the contrary. The trial court therefore erred in determining that the test was faulty.

### DECISION

The trial court's order rescinding the revocation of Kadrlik's driving privileges is reversed.

Reversed.