Walter Thomas BOND, petitioner,
Respondent (C2–97–719),

Laurie Carole Butler, petitioner,
Respondent (CX–97–726),

Kristen Anne Nelson, petitioner,
Appellant (C6–97–1016),

v.

COMMISSIONER OF PUBLIC SAFETY,
Appellant (C2–97–719, CX–97–726),
Respondent (C6–97–1016).

Nos. C2–97–719, CX–97–726
and C6–97–1016.

Court of Appeals of Minnesota.

Nov. 18, 1997.

Marc S. Berris, Minneapolis, for respondent Bond.

James H. Leviton, Minneapolis, for respondent Butler.

Paul C. Engh, Minneapolis, for respondent Nelson.

Hubert H. Humphrey III, Attorney General, Joel A. Watne, Assistant Attorney General, St. Paul, for Commissioner.

Considered and decided by PARKER, P.J., and CRIPPEN, KALITOWSKI, SHORT and PETERSON, JJ.

## OPINION

PETERSON, Judge.

These three consolidated appeals are from orders rescinding driver's license revocations. In each case, the appellant's driver's license was revoked after the appellant submitted to an Intoxilyzer breath test and the test results indicated an alcohol concentration greater than .10. In each case, the district court rescinded the license revocation after determining that the Intoxilyzer test results were inadmissible because the Commissioner of Public Safety did not produce foundation evidence showing that the simulator solution used to conduct the tests had been changed in a timely manner. This court consolidated the appeals for decision. Respondent Butler has not filed a brief and her appeal is proceeding pursuant to Minn. R. Civ.App. P. 142.03. We reverse.

## FACTS

The driver in each case was arrested for DWI. After the arresting officers invoked the implied consent law, the drivers agreed to take breath tests. The officers who administered the tests were certified Intoxilyzer operators.

The officers observed each driver for 15 to 20 minutes before starting the test to ensure that the drivers did not put anything into their mouths, burp, or vomit. They then began the tests. Each machine performed an internal diagnostic procedure, which showed a result of "OK."

Next, each machine performed an air blank test to ensure that the testing chamber was purged before taking a breath sample.

The results were .000 for all drivers, the desired reading.

Each driver then provided a breath sample and the machines gave an initial reading and then a replicate reading from re-analyzing each breath sample. Bond had an initial reading of .128, and a replicate reading of .127. Butler had an initial reading of .195, and a replicate reading of .201. Nelson had an initial reading of .129, and a replicate reading of .136. Air blank tests were again performed, and again yielded results of .000 for all drivers.

The standard simulator solution test was then performed using a standard solution provided by the Bureau of Criminal Apprehension. The standard solution has a known alcohol concentration of .11, and test results between .10 and .12 are acceptable. In Bond's test, the simulator solution tested at .111 with a replicate test result of .112. In Butler's test, the readings for the standard solution were .110 and .111. In Nelson's test, the solution tested at .108 and .109. After the simulator solution test, the air blank test was performed again, and again yielded results of .000 for all drivers.

The officers then tested a second breath sample from each driver. Bond's test produced an initial reading of .129, and a replicate reading of .129. Butler's test produced an initial reading of .195, and a replicate test of .197. Nelson's test produced an initial reading of .122, and a replicate reading of .127. A final air blank test produced readings of .000 for all three drivers.

The final test results were calculated. Bond had a breath correlation of 99%, with a final alcohol concentration of .12. Butler had a breath correlation of 99%, with an alcohol concentration of .19. Nelson had a breath correlation of 94%, with an alcohol concentration of .12. Each driver's license was revoked and each sought judicial review of the revocation.

In all three review proceedings, the district courts determined that the Intoxilyzer test results were inadmissible because the commissioner failed to establish that the standard simulator solution used in the Intoxilyzer machines had been changed in a timely manner. The court found that Bond's

test results were inadmissible because there was no evidence that the simulator solution had been changed in a timely fashion. The court required the foundation for Nelson's test results to include either the Intoxilyzer log sheet or testimony by the testing officer that he observed the log sheet and it showed that the simulator solution had been timely changed. Intoxilyzer log sheets introduced by respondent Butler showed that an officer had timely changed the simulator solution, but also indicated that the simulator solution numbers on the log sheets for both before and after the change were the same. The court determined that the same number on both log sheets raised the possibility that the same solution had been used beyond its expiration date and without testimony by an officer with personal knowledge that the solution in fact had been changed as indicated on the log sheet, there was not adequate foundation for the test results. The district courts rescinded the license revocations.

## ISSUE

In a judicial review hearing under the implied consent law, are Intoxilyzer test results admissible if the commissioner has not presented foundation evidence showing that the simulator solution used to perform the Intoxilyzer test was changed in a timely manner?

## ANALYSIS

■ A driver who seeks judicial review of a license revocation under the implied consent statute may challenge the validity and reliability of the test method used to produce alcohol concentration test results. Minn. Stat. § 169.123, subd. 6(3) (1994).[1] In each of these cases, the driver contended that the Intoxilyzer test was not valid and reliable because the commissioner did not show that the standard simulator solution used in the Intoxilyzer instrument had been changed in a timely manner. In each case, the district court determined that because the commissioner did not produce evidence indicating that the simulator solution had been changed in a timely manner, the test results were inadmissible for lack of foundation.

■ Generally,

[e]videntiary rulings on foundation are committed to the sound discretion of the trial judge and are not the basis for reversal unless that discretion has been clearly abused.

*Kelzer v. Wachholz,* 381 N.W.2d 852, 854 (Minn.App.1986). However, this court concluded in *Ahrens v. Commissioner of Pub. Safety,* 396 N.W.2d 653, 656 (Minn.App.1986) that the implied consent statutory scheme limits the district court's discretion regarding the foundation required for admitting Intoxilyzer test results as a matter of law.

Minn.Stat. § 634.16 (1996) provides:

In any civil or criminal hearing or trial, the results of an infrared breath-test, when performed by a person who has been fully trained in the use of an infrared breath-testing instrument, as defined in section 169.01, subdivision 68, pursuant to training given or approved by the commissioner of public safety or the commissioner's acting agent, are admissible in evidence without antecedent expert testimony that an infrared breath-testing instrument provides a trustworthy and reliable measure of the alcohol in the breath.

■ The *Ahrens* court explained that because an Intoxilyzer is an infrared breath-testing instrument under Minn.Stat. § 169.01, subd. 68, the commissioner establishes a prima facie foundation for admitting Intoxilyzer test results in an implied consent judicial review hearing by demonstrating that the Intoxilyzer test was performed by a properly trained person; the commissioner does not have an affirmative burden to produce records that demonstrate that the standard simulator solution used in the Intoxilyzer has been changed in a timely fashion. *Ahrens,* 396 N.W.2d at 656 (Minn.App.1986).

Once a prima facie showing of trustworthy administration has occurred, it is incumbent on the opponent to suggest a reason why the test was untrustworthy.

*Id.* at 655–56.

If the prima facie showing of the test's reliability is challenged, "the judge must rule upon the admissibility in the light of the entire evidence."

1. The version of the statute found at Minn.Stat. § 169.123, subd. 6 (1996) is applicable to crimes committed on or after August 1, 1997. 1996

Minn. Laws ch. 442, §§ 17, 37(c). The crimes in this case occurred prior to that date.

*Noren v. Commissioner of Pub. Safety,* 363 N.W.2d 315, 318 (Minn.App.1985) (citation omitted).

In the cases of Bond and Nelson, the commissioner established a prima facie foundation for admitting the Intoxilyzer test results by demonstrating that a properly trained person performed the Intoxilyzer tests pursuant to training approved by the commissioner. At that point, the test results were admissible unless the driver produced evidence suggesting a reason why the test was not trustworthy. Had either driver produced such evidence, it would then have been proper for the district court to rule upon the admissibility of the test results in the light of all the evidence. But neither driver produced evidence that suggested the test was not trustworthy. Therefore, the commissioner's prima facie showing of trustworthy test administration was not challenged and established the required foundation for admitting the test results. The district courts erred by requiring additional foundation evidence.

■ In Butler's case, the commissioner presented a prima facie showing of trustworthy test administration. Butler then introduced log sheets for the Intoxilyzer used to conduct the test. The log sheets showed that the standard simulator solution had been changed in a timely manner, but the solution number was the same on the log sheets for both before and after the change. The officer who conducted the Intoxilyzer test testified that the simulator solution number was the same on both log sheets because the BCA provides simulator solution in packages of six bottles, and all six bottles bear the same solution batch number. When the simulator solution is changed using a successive bottle from the same package, the solution numbers on the successive log pages are the same. The officer also testified that he was not present when the solution was changed, but reiterated that the log pages submitted by respondent Butler indicated that the solution was changed. The district court determined that the same solution number on both log sheets raised the possibility that the solution had been used beyond its expiration date and concluded that the commissioner had not met the burden of establishing the accuracy of the test.

■ Establishing a mere possibility that the simulator solution had been used beyond its expiration date was not sufficient to rebut the prima facie foundation established by the commissioner. "The proponent [of Intoxilyzer test results] does not have an absolute burden to show trustworthiness." *Hager v. Commissioner of Pub. Safety,* 382 N.W.2d 907, 909 (Minn.App.1986). The district court was free to disbelieve the officer's explanation for the same solution number appearing on two log sheets. But there was no evidence that suggested that the presence of the same number on the two log sheets in any way indicated that the Intoxilyzer test was not trustworthy. Absent any such evidence, the district court abused its discretion by concluding that the commissioner had not established the accuracy of the Intoxilyzer test.

The commissioner met his burden of establishing a foundation for the Intoxilyzer test results. In each case, the evidence indicated that a properly trained person performed the test, and there was no evidence indicating that the Intoxilyzer test was not trustworthy.

### DECISION

The district courts erred in concluding that the foundation for admitting Intoxilyzer test results must include evidence that demonstrates that the standard simulator solution used to conduct the tests was changed in a timely manner. The Intoxilyzer test results were admissible.

**Reversed.**